UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL D. VALENTINE,<br><br>Defendant. | CASE NO. 2:23-cr-00001-MHW<br><br>JUDGE WATSON |

## GOVERNMENT'S SENTENCING MEMORANDUM

**A.  Introduction**

Defendant Michael Valentine has pleaded guilty to possessing and training over fifty dogs for the purpose of having them participate in dog fights. Based on the facts of this case, a sentence at the high end of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range is appropriate.

**B.  Legal Framework**

The Animal Welfare Act makes it unlawful to "knowingly sell, buy, possess, train, transport, deliver, or receive any animal for purposes of having the animal participate in an animal fighting venture." 7 U.S.C. § 2156(b). Each of these violations is punishable by the same maximum penalty – five years in prison. 18 U.S.C. § 49.

**C.  Background Regarding Dog Fighting**

Organized dog fighting of the type involved in this case bears no resemblance to the quarreling that pet dogs might do in a backyard over a toy. It is an extreme form of cruelty to animals – not only inside the fighting ring itself, but also in the specific practices leading up to a fight and, if either dog survives, after a fight. A survey of the grotesque rituals of the dog

fighting "industry" can be found in an annotated memorandum authored by Judge Reagan of the Southern District of Illinois as part of the sentencing proceedings in *United States v. Berry, et al.*, 3:09-cr-30101, 2010 WL 1882057 (S.D. Ill., May 11, 2010). Attachment 1.[1]

This survey summarizes the nature of the crime, the burden it places on communities, and its links to other types of criminal activity. As Judge Reagan's memorandum shows, dog fighters take cruel advantage of pit bull-type dogs' eagerness to please humans, all for gambling purposes, financial gain, or a disturbing form of "entertainment."

**D.  Federal Dog Fighting Sentencing History**

Congress first enacted the federal animal fighting prohibition in 1976. *See* Pub. L. No. 94-279, § 17, Apr. 22, 1976, 90 Stat. 421. It was prosecuted for the first time twenty-two years later, and not again until the prosecution of Michael Vick in 2007. The Vick case exposed the public for the first time to the true "horrors of dog fighting," Att. 1 at 21, including the acute animal suffering that occurs before, during, and after dog fights. In particular, the defendants in that case admitted as part of their guilty pleas to having drowned, hung, and bludgeoned underperforming fighting dogs to death. The following year, Congress increased the penalty to a five-year felony and significantly broadened the scope of the offense. *See* Pub. L. No. 110-234, Title XIV, § 14207(a), May 22, 2008.

Since that time, federal and state authorities have increased prosecutions in this area. But even so, only a few dozen defendants have been prosecuted in federal dog fighting cases since the first federal prosecution in 1998. From this relatively small body of cases, a clear pattern has emerged from the sentencing case law: a notable trend toward top-end and above-Guidelines

---

[1] Some of the defendants in *Berry* challenged the district court's reliance on this memorandum on appeal. The Seventh Circuit rejected this challenge, affirming both the district court's use of its own sentencing memorandum, and the above-Guidelines sentences imposed in that dog fighting case. *See United States v. Courtland, et al.*, 642 F.3d 545, 551 (7th Cir. 2011).

2

sentences, based largely on the cruelty of the offense. The U.S. Sentencing Commission also increased the base offense level of the pertinent Guideline, U.S.S.G. §2E3.1, from 10 to 16, in November, 2016. The Commission stated that the increased base offense level "better accounts for the cruelty and violence that is characteristic of these crimes." Sentencing Guidelines for United States Courts, 81 Fed. Reg. 27,262, 27,265 (May 5, 2016).

When it increased the base offense level in 2016, the Commission found that "offenders who received the base offense level of 10 under § 2E3.1" had been sentenced to above-Guidelines sentences at a rate more than fifteen times higher than the average across all offenses. *Id.* Further, "[f]or those animal fighting offenders sentenced above the range, the average extent of the upward departure was more than twice the length of imprisonment at the high end of the guideline range." *Id.*; *see also id.* (finding "a high percentage of above range sentences in these cases").

Even after the Sentencing Commission increased the base offense level in 2016, defendants in some dog fighting cases have still received sentences well above the Guidelines range, which were sustained on appeal. *See*, *e.g.*, *Richardson*, *supra*, 2017 WL 6055773, *2-3 (varying upward from 12-18 month Guidelines range to 96 months), *aff'd*, 796 Fed. App'x at 803; *Chadwick*, *supra*, 2017 WL 6055384, *2-3 (same case, upward variance from 12-28 month Guidelines range to 60-month sentence; affirmed in same appeal); *United States v. Cook*, 7:16-cr-122, 2017 WL 6055385, *2 (E.D.N.C. Dec. 1, 2017) (varying upward from 15-21 month Guidelines range to 45 month sentence; affirmed in same appeal); *United States v. Thompson*, 7:16-cr-122 (E.D.N.C. Dec. 22, 2017) (varying upward from 24-30 month Guidelines range to 48 month sentence; affirmed in same appeal). Although not all federal defendants in dog fighting

3

cases have received above-Guidelines sentences, there has been a clear trend among judges in these cases to impose significant sentences.

**E.    Factual Summary**

As described in the Statement of Facts, Defendant Valentine was first investigated for raising fighting dogs in 2019. What is not mentioned in the Statement of Facts is the tragic circumstance precipitating that investigation: On June 22, 2019, one of the fighting dogs being raised by Mr. Valentine got loose and viciously attacked the 5-year-old son of the Defendant's girlfriend. As can be seen in the photographs taken at the hospital, the attack had devastating consequences for the minor victim. *See* Attachment 2 (SEALED). The results of the attack are perhaps not surprising, given the training and conditioning that fighting dogs receive. Dog fighters, including Defendant Valentine, breed and train their dogs to increase strength and aggression.

After the attack on the child, a search warrant was executed at the Defendant's property. The search revealed 40 dogs on the Defendants' property, *see* Attachment 3 (Search Warrant Photos), as well as many of the usual hallmarks of a significant dogfighting operation. Among other paraphernalia, the Defendant had an electric treadmill to exercise his dogs, a "cat mill" (a device whereby a dog would run in circles chasing a tethered animal, typically a cat), and "flirt poles" to promote agility, strength and aggression.

As a consequence of their aggression, dogs used in animal fighting ventures are housed separately from other dogs, in pens, cages, or on chains, so that they will not hurt or kill other dogs when the handler is absent. As documented in Attachment 3, this is exactly how Defendant Valentine housed his dogs. Each was kept either in a separate kennel or "run" or else tethered to

a chain where it could not reach other dogs. The chains are large and heavy, building the dog's strength and stamina as it carries the weight around its neck.

Dogs selected and raised to promote aggression often pose a danger to one another during the breeding process as well, such that a "breeding stand" must be used. This is a device designed to restrain a female dog so that it cannot bite the male dog during the mating process. Mr. Valentine was in the possession of such a breeding stand.

As further evidence of the Defendant's purpose, he had various veterinary supplies, including syringes and a skin stapler. This latter device would be used to try and close any wounds a dog might receive during a fight. The defendant also had a saline enema, a device used by dog fighters either to help their dog "make weight" in advance of a fight, or to empty the dog out just before a fight. The Defendant was also in the possession of additional dog fighting paraphernalia including VHS tapes, DVDs, signed memorabilia, and instructional materials. *See, e.g.,* Attachment 4 (VHS tapes, and *Japan Pit Fights* screengrabs).

In addition, the Defendant maintained a website, gamekeeperkennels.com, and posted his dogs to a website, thepitbullbible.com. *See* Attachment 5. The websites contained numerous references to dog fighting, including indications that the Defendant's dogs were from various famous dog-fighting lineages. The websites also contain coded references used by dog fighters, including:

- "CH" (Champion) – A fighting dog that has won three contracted dog-fighting matches.
- "1 XW" (1-time winner) –a fighting dog that has won one contracted match.
- "1XL" (1-time loser) –a fighting dog that has lost one contracted match.
- "4XW" (4-time winner) –a fighting dog that has won four contracted matches.

- "POR" (Producer of Record) - list created and maintained by a dog-fighting magazine named YOUR FRIEND AND MINE.
- "ROM" (Register of Merit) - list created and maintained by the dog-fighting magazine named SPORTING DOG JOURNAL.

Following the search warrant in June 2019, the Defendant agreed to surrender the 40 dogs recovered on his property.

Sometime after June of 2019, the Defendant began a similar dog-fighting operation on a nearby parcel of land off of Scenic Drive in Vinton, Ohio. *See* Attachment 6. As before, the dogs were kept in individual kennels, or else tied out on heavy chains. The Defendant also kept posting to the pitbullbible.com, including listing dogs for sale as late as October, 5, 2020. *See* Attachment 5, p. 6.

On March 8, 2022, a search warrant was obtained for the Defendant's property off of Vinton Rd. During the execution of the search, 11 dogs were recovered. *See* Attachment 6 (Search Warrant Photos). A twelfth dog (which was pregnant) was located in a shed adjacent to the Defendant's residence on Mt. Olive Rd. *See id.,* p. 4.

**F.     Sentencing Analysis**

    **1.     The Base Offense Level for Dog Fighting Offenses is 16**

Defendant pleaded guilty to two counts of violating the animal fighting prohibitions of the Animal Welfare Act by possessing and training dogs for purposes of dog fighting. Under U.S.S.G. § 2E3.1, the Defendant's base offense level for each count is 16.

    **2.     The Defendant Should Receive an Upward Departure of 2 points**

Based upon the large number of dogs the Defendant possessed and trained, he should receive an upward departure of at least 2 points. The Sentencing Guidelines contemplates just

such a departure in Application Note 2(B), where it advises courts that an upward departure may be warranted if the offense involves "an unusually large number of animals." Here, the Defendant has admitted to possessing and training 51 dogs for purposes of dog-fighting. Even within the world of dog-fighting, 51 is an exceptionally large number of dogs. Previous dog-fighting cases have generally involved fewer, and often far fewer dogs than this. For example:

- *United States v. Meyers*, 1:18-cr-58 (M.D. Ga. Sep. 24, 2021) – 27 dogs
- *United States v. Love*, 3:17-cr-51 (D.N.J. Jul. 8, 2019) - 6 dogs
- *United States v. Gaines*, 3:17-cr-309 (D.N.J. Mar. 5, 2018) - 6 dogs
- *United States v. Arellano*, 3:17-cr-51 (D.N.J. Apr. 10, 2019) - 13 dogs
- *United States v. Chadwick*, 7:16-cr-122, 2017 WL 6055384, *2-3 (E.D.N.C. Dec. 1, 2017) - 33 dogs
- *United States v. Cook*, 7:16-cr-122, 2017 WL 6055385, *2 (E.D.N.C. Dec. 1, 2017) - 23 dogs
- *United States v. Richardson*, 7:16-cr-122, 2017 WL 6055773, *2-3 (E.D.N.C. Dec. 1, 2017) - 32 dogs

Based upon the number of dogs possessed by the Defendant, his offense level should be increased by at least two levels.

**3.    The Defendant's Two Dog-Fighting Offenses Should Not Group**

The Defendants two dog-fighting offenses are not closely-related and should not group under U.S.S.G. § 3D1.2. As set out in the Defendant's Statement of Facts, the Defendant's offenses were separated in time by almost two years, and occurred in two different locations. In addition, these two offenses involved different dogs. Consequently, the counts do not involve the

same act or transaction, or the same victims. *See id.* Under these circumstances, the two offenses should not group together. *See* U.S.S.G. Commentary to Ch. 3, Part D, Illustration 1 ("Defendant A was convicted of four counts, each charging robbery of a different bank. Each would represent a distinct Group."). *See also United States v. Wolfe*, 2022 WL 17609467 at *7 (6th Cir. Dec. 13, 2022) ("Counts 2 through 4 could not be grouped together because they involved different victims and separate transactions.").

Because the Defendant's offenses do not group, and because both offenses have a base offense level of 16, the Defendant should receive an additional Unit under U.S.S.G. § 3D1.4(a), regardless of the application of any upward departure. An additional unit will increase the Defendant's Offense Level by two levels. *See* U.S.S.G. § 3D1.4 (table).

### 4. The Defendant's Guideline Range is 24-30 Months.

After application of the upward departure provision of U.S.S.G. § 2E3.1, Application Note 2(B), and the additional two units under U.S.S.G. §3D1.4, the Defendant has a total offense level of 20. Because Defendant timely entered a guilty plea, the Defendant is entitled to a three-point reduction under U.S.S.G. §3E1.1, bringing his total offense level to 17. Defendant's Guidelines-range sentence is therefore 24-30 months, based on a criminal history category of I.

### 5. The 3553(a) Factors and Precedent In Similar Cases Weigh In Favor of a Sentence at the High-End of the Guidelines

In addition to considering the advisory Guidelines range sentence, courts must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the seriousness of the offense, the need to provide deterrence and promote respect for the law, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(1)-(7). When those factors are applied to the facts and counts of conviction here, a sentence at the high-end of the

8

Guideline range, that is a sentence of 30 months based on the Government's Guideline calculation, would be appropriate, and would avoid sentencing disparities when compared to similar cases.

### a) Nature and Circumstances of the Offense

Of the dog fighting cases that have been previously sentenced, many have received sentences that were at the high end (or above) the sentencing range calculated by the Court. Many of these were premised on upward variances under 18 U.S.C. § 3553(a)(1), due to the nature and circumstances of the offense. For instance, in *United States v. Gaines*, a companion case to *Love* and *Arellano*, the court varied upward to a sentence of 42 months under the pre-2016 Guideline, finding that:

> this offense embodies such cruelty, just the enterprise of training dogs to fight, of staging dogs to fight, of keeping dogs in boxes in the basement, of medicating them by people who are not trained in medicine, clearly not professionals, all of the materials that were seized showed how these dogs were treated by these amateurs with all kinds of medications that were for cattle and for other kinds of animals, the very concept of this enterprise of staging dogs to fight each other and kill each other is so despicable and so uncivilized that I think the nature of the offense warrants a variance.

*United States v. Gaines*, 3:17-cr-309, Tr. of Sentencing H'g at 17 (D.N.J. Mar. 5, 2018), *aff'd*, 765 Fed. App'x 730, 733 (3d Cir. Apr. 3, 2019) (affirming above-Guidelines sentence and remarking that the case was "a sad reminder that man's best friend is susceptible to man's worst impulses"); *see also id.* at 19 ("I don't know that there's any way we can quantify really how harmful this crime is"). It should be noted that most of the defendants in that case had a criminal history score of I.

The facts of this case show why such strong sentiments are warranted. The defendant was in possession of an extremely large number of fighting dogs. The harm that was to be visited upon these dogs, their offspring, and their opponents is difficult to quantify, but it is nonetheless

9

inescapable. What is more, the dogs posed a hazard to humans as well, a fact which was unfortunately realized here.

### b) History and Characteristics of the Defendant

The history and characteristics of the Defendant show that he was not only a serious dog fighter, but that he was willing to continue fighting dogs even after the danger to himself and others was laid bare. Following the 2019 search warrant, the Defendant had every opportunity to reflect upon his conduct. A 5-year-old child had been grievously wounded, and Valentine himself was under criminal investigation. Despite this, he decided to continue engaging in this cruel blood sport.

At the same time, as we now know, the Defendant was engaged in a significant drug distribution operation. As detailed more thoroughly in the Government's Sentencing Matter in 22-cr-00052, the Defendant was responsible for distributing a significant quantity of fentanyl, a drug that has devastating consequences for the communities in which it is sold.

These history and characteristics weigh strongly in favor of a sentence at the high-end of the guideline range calculated by the Court.

### c) Seriousness of the Offense, Respect for the Law and Just Punishment

Over the last decade, there has been increased public awareness of the serious, violent nature of animal fighting, as reflected by Congress's repeated strengthening of the Animal Welfare Act. The recent amendment of the substantive guideline by the Sentencing Commission, discussed further above, further underscores the seriousness of the offense. *See* Sentencing Guidelines for United States Courts, 81 Fed. Reg. at 27,265 ("[t]he Commission [ ] determined that the increased base offense level better accounts for the cruelty and violence that is characteristic of these crimes"). Also, given the extensive, secretive networks that are needed

to solicit opponents and to locate, buy and sell dogs of particular coveted bloodlines, dog fighting is organized crime in the traditional sense of that term.

The costs of dog fighting are borne not only by the direct victims, the dogs, but also by the communities in which this activity is engaged. Undesirable dogs are often killed by their owners, or else abandoned at shelters. Furthermore, dogs that escape their confinement pose a particular hazard, as demonstrated here. These factors weigh in favor of a serious punishment.

### d) Need to Afford Adequate Deterrence to Criminal Conduct

General deterrence will only be served if the Defendant receives a significant punishment. Dog fighting is a highly secretive enterprise that is difficult for law enforcement and investigative professionals to infiltrate. A dog fighting investigation requires many of the same skills and resources employed in major undercover narcotics investigations, thus challenging the resources of any agency that seeks to respond to it.

Given the limited law enforcement resources available for cases such as this, and the strain it places upon animal shelters called upon to care for the large numbers of dogs seized in these investigations, it is imperative that the sentences imposed in the few cases that are able to be brought send a strong message of deterrence. Those who choose to brutalize animals for entertainment and profit must know that their criminal conduct will be severely punished. *See Gaines*, *supra*, Tr. of Sentencing H'g at 18 ("animal cruelty is a horrible offense, uncivilized, and warrants punishment and deterrence. It's important for society to know that this is a serious offense, that it's a grievous offense, that the animals deserve something better than this"). Consequently, a strong sentence is needed to "afford adequate deterrence to criminal conduct," to other potential offenders. 18 U.S.C. § 3553(a)(2)(B).

In addition, a strong sentence would help achieve individual deterrence. As described earlier, the Defendant would not be deterred. Even after he was under criminal investigation, he

11

was not deterred. In such circumstances, a sentence at the high-end of the guideline range is appropriate to promote individual deterrence.

### e) Avoiding Unwarranted Sentencing Disparities Among Similarly Situated Defendants

The dog fighting cases cited above provide a reference point in avoiding unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6). Below are the sentences received by the defendants in those cases, all of whom were responsible for training fewer dogs than the Defendant:

- United States v. Meyers, 1:18-cr-58 (M.D. Ga. Sep. 24, 2021) – 27 dogs, 123 months (60 months on dog fighting, run consecutive to 63 months for gun charge for bringing gun to dog fight)
- United States v. Love, 3:17-cr-51 (D.N.J. Jul. 8, 2019) - 6 dogs, 54 months
- United States v. Gaines, 3:17-cr-309 (D.N.J. Mar. 5, 2018) - 6 dogs, 42 months
- United States v. Arellano, 3:17-cr-51 (D.N.J. Apr. 10, 2019) - 13 dogs, 48 months
- United States v. Chadwick, 7:16-cr-122, 2017 WL 6055384, *2-3 (E.D.N.C. Dec. 1, 2017) - 33 dogs, 60 months
- United States v. Cook, 7:16-cr-122, 2017 WL 6055385, *2 (E.D.N.C. Dec. 1, 2017) - 23 dogs, 45 months
- United States v. Richardson, 7:16-cr-122, 2017 WL 6055773, *2-3 (E.D.N.C. Dec. 1, 2017) - 32 dogs, 60 months

As these sentences make clear, a sentence at the high end of the Guideline range is necessary to avoid unwarranted sentence disparities.

**G.     Conclusion**

Considering all of the 18 U.S.C. § 3553 factors, the relevant Guideline provisions and case law discussed above, and the applicable departure, a sentence at the high-end of the applicable guideline range, that is, a sentence of 30 months is warranted. In accordance with the plea agreement signed by the parties, the Government does not oppose a concurrent sentence to the sentence received in 2:22-cr-00052-MHW, provided that the Defendant is subjected to the statutory mandatory minimum sentence, as contemplated by the parties.

    Respectfully submitted,

    KENNETH PARKER
    UNITED STATES ATTORNEY

    TODD KIM
    ASSISTANT ATTORNEY GENERAL
    Environment and Natural Resources Division
    U.S. Department of Justice

    */s Adam C. Cullman*
    Adam C. Cullman (KY #93912)
    Special Assistant United States Attorney &
    Senior Trial Attorney, Environmental Crimes Section
    Environment and Natural Resources Division
    221 E. 4th St. Ste. 400
    Cincinnati, Ohio 45244

*s/ Nicole Pakiz*
NICOLE PAKIZ (0096242)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, OH 43215
Phone: 614-255-1611
nicole.pakiz@usdoj.gov

J. Michael Marous (0015322)
Special Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of January 2023, a copy of the foregoing Government's Sentencing Memorandum was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

*/s Adam C. Cullman*
Adam C. Cullman (KY #93912)
Special Assistant United States Attorney &
Senior Trial Attorney, Environmental Crimes Section